1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,              Case No.  21-cr-00352-JSW-1

          Plaintiff,
8
                                            **ORDER DENYING MOTION TO**
9          v.                               **SUPPRESS EVIDENCE**

10   MARNIQUE SIMON,                         Re: Dkt. No. 59

          Defendant.
11

12

13         Now before the Court for consideration is the motion to suppress filed by Defendant

14   Marnique Simon ("Defendant").  The Court has determined that an evidentiary hearing is not

15   required.  The Court has considered the parties' papers, relevant legal authority, and the record in

16   the case, and it finds this matter suitable for disposition without oral argument.  For the following

17   reasons, the Court DENIES Defendant's motion.

18                                        **BACKGROUND**

19         On May 29, 2020, two Richmond police officers, Officer Ecker and Officer Parker,

20   stopped Defendant after he allegedly made a left turn during a red left-turn signal.  (*See*

21   Declaration of Graham Archer ("Archer Decl."), Ex. A, Richmond Police Department Report

22   ("RPD Report") at HUMPHREY-000004.)  Officer Ecker approached the driver side of the

23   vehicle and identified Defendant and the front passenger, Ronettaparis Kindred ("Ms. Kindred").

24   (Archer Decl., Ex. A ("Ecker BWC") at 1:00-1:20; *see also* Declaration of John Ecker ("Ecker

25   Decl."), ¶ 5, Ex. A.)  Officer Ecker asked Defendant for his identification.  He also asked

26   Defendant if was on probation or parole.  Defendant did not respond.  When prompted again by

27   Officer Ecker, Mr. Simon responded "Nah."  (Ecker BWC at 1:21-1:27.)

28         After confirming the car was registered to Defendant, Officer Ecker returned to his police

vehicle to run a records check. Officer Ecker attests that he entered Defendant's identification number, name, number, gender, and date of birth. (Ecker Decl. ¶ 8; Ecker BWC at 1:40-4:10.) The query Officer Ecker initiated typically reports various information regarding a stopped vehicle and driver, including information regarding a driver's identity, California driving records, active warrants, restraining orders, and probation or parole status. (*Id*.; *see also* Supplemental Declaration of John Ecker ("Ecker Supp. Decl.") ¶¶ 4-6.) The results of the query informed Officer Ecker that Defendant was on parole. (Ecker Decl. ¶ 8; Ex. B (Simon_000147); *see also* Declaration of Frank Tamburello ("Tamburello Decl."), Ex. 1.)

Officer Ecker knew from training and experience that California parolees are subject to a search condition that permits the search of their person, residence, and any property under their control at any time, with or without a search warrant, and with or without cause. (Ecker Decl ¶ 9; Govt's Opp'n., Ex. C.) Upon learning of Defendant's parole status, Officer Ecker planned to search Defendant and his vehicle as was his customary practice with all parolees with whom he encounters. (*Id*.)

When Officer Ecker returned to the vehicle, he asked Defendant why he had lied about being on parole. (Ecker BWC at 4:21-4:42.) Officer Ecker then directed Defendant to put his hands on his head and get out of the car. (*Id*. at 4:50-5:00.) Defendant complied, and Officer Ecker handcuffed him and patted him down. (*Id*. at 5:03-5:11.) Officer Ecker then directed Defendant to sit on the front bumper of the police vehicle and asked Ms. Kindred to exit the vehicle and wait with Defendant while he searched the car. (*Id*. at 5:11-6:20.) During the search of the vehicle, Officer Ecker found a gun under the front passenger seat where Ms. Kindred had been sitting. (Ecker Decl. ¶ 11; Ecker BWC at 6:24-9:43.)

Officer Ecker instructed Officer Parker to handcuff Ms. Kindred because at that time the officers had not identified who possessed the firearm. (Ecker Decl. ¶ 12.) The officers separated the two individuals. Defendant was taken to the police car and Officer Parker took Ms. Kindred's statement. She stated she was dating Defendant and did not know about anything illegal in the car. She said it was not her car. (Archer Decl., Ex. C ("Parker BWC") at 11:05-15:40.) After Officer Parker reported this information to Officer Ecker, Officer Ecker further questioned Ms.

United States District Court
Northern District of California

2

1    Kindred and informed her that both she and Defendant would be arrested for the gun if neither

2    party claimed it.  (Ecker BWC at 19:10-20:05.)

3         Officer Ecker then returned to the police car and advised Defendant of his rights.  (*Id*. at

4    20:26-21:47.)  Officer Ecker repeated several of the warnings.  Defendant acknowledged his

5    understanding.  (*Id*.)  Officer Ecker asked Defendant what was in the car, and Defendant stated, "I

6    don't want to talk, I don't want to say nothing, I don't want to talk unless I have an attorney

7    present."  Officer Ecker responded, "Okay.  That's fine.  I guess both of you are going then."  (*Id*.

8    at 21:48-22:10.)  The officers placed both Defendant and Ms. Kindred in the back of the patrol

9    vehicle, and Officer Ecker place his bodycam in the vehicle to capture any conversation between

10   the two.  (RPD Report at HUMPHREY-000005.)

11        After attending to other matters related to the investigation, Officer Ecker returned to the

12   police vehicle, and Defendant told Officer Ecker that he did not want Ms. Kindred to take

13   responsibility for the gun.  (Ecker BWC at 29:29-29:37.)  Officer Ecker told Defendant, "you just

14   told me you didn't want to talk without an attorney, are you telling me you want to talk without an

15   attorney now?"  (*Id*. at 29:38-29:45.)  Officer Ecker attests that at this point he left the police car

16   so that Defendant could not make further statements to him and called his Sergeant to discuss the

17   most appropriate way to respond to Defendant's statements.  (Ecker Decl. ¶ 16.)

18        Officer Ecker returned to the police car, escorted Defendant out of the car, and explained

19   that he needed to reread his rights to ensure Defendant understood them.  (Officer Ecker at BWC

20   34:10-35:28; Ecker Decl. ¶ 17.)  Officer Ecker advised Defendant of his rights, and Defendant

21   stated that he understood.  (*Id*.)  Officer Ecker then asked whether Defendant would like to speak

22   to him without an attorney present and Defendant said "yeah."  (Ecker BWC at 35:19-36.)

23   Defendant told Officer Ecker that Ms. Kindred was not involved with "whatever" the officers

24   found in his car.  (*Id*. at 35:40-47.)  Officer Ecker continued to question Defendant about what was

25   in the car because he believed that Defendant wanted to take general ownership of the items in the

26   car in the hopes the officers would release Ms. Kindred without incriminating himself by

27   admitting his knowledge of the gun.  (Ecker Decl. ¶ 18.)  Defendant eventually referred to weed

28   and the gun, the description of which was consistent with the firearm found in the car.  (Ecker

United States District Court
Northern District of California

BWC at 35:29-37:22.)  The officers released Ms. Kindred and let her take the car.  (RPD Report at HUMPHREY-000005.)  Defendant was indicted on one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. section 922(g)(1).  He now moves to suppress evidence uncovered during the traffic stops and statements he made to the police during the encounter.

## ANALYSIS

### A.    An Evidentiary Hearing is Not Required.

An evidentiary hearing on a suppression motion is necessary "only when the moving papers allege facts with sufficient definiteness, clarity and specificity to enable the trial court to conclude that contested issues of fact exist."  *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000).  Defendant has not identified any material facts in dispute, and the Court concludes that an evidentiary hearing is unnecessary.

### B.    The Traffic Enforcement Stop Was Proper.

An investigatory vehicle stop is lawful when the officer has reasonable suspicion that the vehicle has committed a traffic infraction.  *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006).  Here, the officers stopped Defendant's vehicle after he ran a red light.  Defendant does not argue that the initial traffic enforcement stop was unlawful.

### C.    The Police Officers Did Not Improperly Prolong the Seizure.

The reasonable duration of a traffic stop depends on the stop's mission—to address the traffic violation that triggered the stop and "attend to related safety concerns."  *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015).  The officer's "mission includes 'ordinary inquires incident to [the traffic] stop,'" which typically involve inquires such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id*. at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005).  An "officer's inquiries to matters unrelated to the justification for the stop…do not convert the encounter into something other than a lawful seizure, so long as those inquires do not measurably extend the duration of the stop."  *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  Inquiries into a suspect's past criminal conduct is relevant to officer safety.

4

1    Defendant first argues that Officer Ecker impermissibly prolonged the traffic stop when he

2    asked Defendant whether he was on probation or parole.  After Officer Ecker pulled Defendant

3    over and approached the vehicle, he advised Defendant of the reason he was pulled over and asked

4    for Defendant's identification.  While reviewing the identification provided by Defendant, Officer

5    Ecker asked Defendant if he was on probation or parole, and Defendant said he was not.  Officer

6    Ecker then returned to the patrol car to conduct a records check.

7    The Ninth Circuit has not yet decided if asking whether a driver is on probation is "part of

8    the traffic mission."  At least three judges in this district have held that an officer may not ask a

9    driver whether they are on probation or parole during a traffic stop, as this question "is not aimed

10    at ensuring that vehicles on the road are operated safely and responsible," but rather "is intended

11    to uncover evidence of criminal activity."  *United States v. Mati*, 466 F. Supp. 1046, 1056 (N.D.

12    Cal. 2020), *United States v. Ward*, No. 16-cr-00485-JST-1, 2017 WL 1549474, at *3 (N.D. Cal.

13    May 1, 2017), *Amanuel v. Soares*, No. 13-cv-5258-NC, 2-15 WL 3523173, at *7 (N.D. Cal. June

14    3, 2015).  Based on these decisions, Defendant argues that Officer Ecker's question went beyond

15    the mission of the traffic stop and added time to the stop, thereby rendering the stop

16    unconstitutional.

17    The Government contends that this case is more akin to *United States v. Brown*, No. 20-cr-

18    00358-JST, Dkt. No. 46.  In *Brown*, the defendant moved to suppress evidence that was uncovered

19    during a search of his car after he was pulled over for a traffic violation.  After the officer asked

20    the defendant about probation and parole, he returned to the police car to run a records check using

21    the information provided by the defendant.  The officer was unable to verify the defendant's

22    identity using that information and thus, detained the defendant and sought consent to search the

23    car.  The Court discussed *Rodriguez* and its progeny but found that case did not control the

24    outcome because the officer's inquiry into the defendant's parole status lacked a causal connection

25    to the search of the car that uncovered the evidence in question.  Absent that causal connection,

26    the evidence discovered during the vehicle search could not be "fruit of the poisonous tree," even

27    if the officer's question about the defendant's parole status did unconstitutionally prolong the

28    traffic stop.

United States District Court
Northern District of California

5

The Court finds the instant case analogous to the situation in *Brown*. While Officer Ecker's question may have been improper, it did not cause Officer Ecker to conduct the vehicle search that led to the discovery of the relevant evidence. After asking Defendant about his parole status and receiving Defendant's answer in the negative, Officer Ecker returned to his police car to run a records check, which is part of the ordinary mission of the traffic stop. It was only when the records checks revealed that Defendant was on parole and subject to a search condition that Officer Ecker initiated the search the vehicle that uncovered the gun. Thus, this case is distinguishable from the cases cited by Defendant where a causal connection existed between the improper question about parole and the relevant evidence. *See Mati*, 2020 WL 3128903, at *10 ("[t]he discovery of Mati's probation search condition was…the very object of the prolonged stop"; *Ward*, 2017 WL 1549474, at *3 ("the search of Ward's person and car only occurred because of [the officer's] impermissible questioning"). Here, as in *Brown*, the evidence found during the search of the car is not "fruit of the poisonous tree" because there is no causal connection between the questioning and the search.

Defendant also contends that Officer Ecker impermissibly prolonged the traffic stop by running an additional records check into Defendant's criminal history. Defendant argues that Officer Ecker conducted two queries when he returned to the patrol car to conduct a records check—an operator's license number ("OLN") search, which queries by the license number, and a person search, which queries by name and date of birth. Defendant argues that the second query, which returned the information regarding Defendant's parole status, checked multiple unnecessary criminal-records databases.

Defendant likens this to *United States v. Evans*, in which the Ninth Circuit found that an ex-felon registration check impermissibly prolonged the traffic stop because it was aimed at detecting evidence of ordinary criminal wrongdoing, rather than ensuring the safe operation of vehicles on the road. 786 F.3d 779, 782-83, 85 (9th Cir. 2015). In *Evans*, the defendant was pulled over for committing a minor traffic violation. *Id*. at 784. After stopping the defendant, the officer performed a vehicle records and warrants check, which the Court characterized as "tasks that are 'ordinary inquiries incident to the traffic stop.'" *Id*. at 786 (citing *Rodriguez*, 575 U.S.

6

348).  After completing the records and warrants checks, the officer requested an additional "ex-felon registration check" on the defendant, which took an additional eight minutes.[1]  *Id*.  The Ninth Circuit concluded that the ex-felon registration check, unlike the vehicle records and warrants checks, was "wholly unrelated" to the officer's traffic safety mission.  *Id*. at 786.

Defendant argues that the multiple criminal-justice databases that Officer Ecker queried are like the "ex-felon" registration check in *Evans*.  The Court disagrees.  Officer Ecker attests in his supplemental declaration that he first entered Defendant's license number to quickly obtain and confirm Defendant's name and date of birth, and he used that information to complete the standard records check inquiry.  (*See* Supp. Ecker Decl. ¶ 4.)  Officer Ecker also attests that he did not direct the computer to search particular databases, but he understood that such databases were searched when he entered the driver's identifying information.  (*Id*.)  Officer Ecker also attests that he queries a person based on their license number, first and last name and date of birth to obtain information about the driver's wants, warrants, and criminal history, all of which is relevant to officer and public safety.  (*Id*. ¶ 6.)

Defendant attempts to characterize Officer Ecker's two queries—the OLN and the license number search—as separate, unrelated records checks, but the record shows that both queries were part of the same records check designed to uncover information relevant to the traffic stop.  Nor is there any indication in the record that the searches were done for the purpose of uncovering evidence of independent criminal wrongdoing unrelated to the traffic stop.  Additionally, because the identifying information query that returned the probation status was done in tandem with the license number search, it did not add time to traffic stop.  Thus, this is unlike *Evans* where the problematic ex-felon registration check was a separate report requested *after* the tasks related to the traffic stop were completed.  The Court finds that the records check Officer Ecker performed fall within the scope of "tasks that are ordinary inquires incident to the traffic stop."  *Evans*, 786 F.3d at 786.

---

[1] The Ninth Circuit described the "ex-felon registration check" as "inquiring into Evans' criminal history and then determining whether he was properly registered at the address he provided to [the officer].  *Evans*, 786 F.3d at 783 & n. 5.

1  Accordingly, the records check did not unconstitutionally prolong the traffic stop.  The

2  Court DENIES Defendant's motion on this basis.

3  **D.     Whether the Police Had Probable Cause to Arrest Defendant.**

4  Defendant next argues that the officers lacked probable cause to arrest him because the

5  warrantless arrest does not fall within an established exception to the Fourth Amendment's

6  warrant requirement.  Defendant argues that the arrest occurred when the officers ordered

7  Defendant to exist the vehicle, handcuffed him, and searched him.  The Government contends that

8  no arrest occurred prior to the discovery of the firearm.

9  There is no "bright line rule for determining when an investigatory stop crosses the line

10  and becomes an arrest." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002)

11  (quoting *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988)).  Rather, the determination is

12  a fact intensive inquiry. *Gallegos*, 308 F.3d at 991 (citing *Washington v. Lambert*, 98 F.3d 1181,

13  1185 (9th Cir. 1996)).  Making the determination of whether a seizure was an arrest "may in some

14  instances create difficult line-drawing problems." *United States v. Ricardo D.*, 912 F.2d 337,

15  339–40 (9th Cir. 1990). This sometimes difficult determination is "guided by the general Fourth

16  Amendment requirement of reasonableness." *Gallegos*, 308 F.3d at 991.  The Fourth Amendment

17  requires the court to look at the totality of the circumstances and consider 1) the intrusiveness of

18  the stop, which includes the aggressiveness of the police methods, and 2) the justification for the

19  use of such tactics. *Washington*, 98 F.3d at 1185.  The determination is essentially an evaluation

20  of "not only how intrusive the stop was, but also whether the methods used were reasonable given

21  the specific circumstances." *Id*.

22  An investigative detention must be "temporary and last no longer than is necessary to

23  effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983).  The methods

24  used during the stop should be the "least intrusive means reasonably available to verify or dispel

25  the officer's suspicion in a short period of time." *Id*.  The use of handcuffs or other restraints is

26  one factor that is to be considered in whether an arrest has taken place.  It has been observed that

27  use of restraints "substantially aggravates the intrusiveness of an otherwise routine investigatory

28  detention…" *Washington*, 98 F.3d at 1188 (quoting *United States v. Bautista*, 684 F.2d 1286,

1289 (9th Cir. 1982).

Here, Officer Ecker directed Defendant to exit his vehicle and place his hands on his head. Officer Ecker than patted Defendant down and placed him in handcuffs while he searched the vehicle. Officer Ecker told Defendant that he was not under arrest. During the search, Defendant and Ms. Kindred sat next to each other on the bumper of the police car. Defendant was compliant with Officer Ecker's requests. Officer Ecker attests that he was concerned for his safety because Defendant had lied about being on parole status, and in his experience, persons who lie about their parole status are usually trying to avoid a search that will uncover something illegal in their possession. Officer Ecker further asserts that Defendant's prior Penal Code section 187 conviction added to his concern that defendant may have an accessible firearm.

In evaluating the totality of the circumstances, the Court first considers the intrusiveness of the stop. On the one hand, it was not unreasonable for the officers to order Defendant to exit the vehicle during the search. Moreover, the detention was relatively brief, and Officer Ecker did not use aggressive tactics. These factors weigh against intrusiveness. However, the use of handcuffs increased the intrusiveness of the stop. Moreover, given the circumstances of the traffic stop, the use of handcuffs was not reasonable. Defendant was cooperative with the officers and had not taken any actions that suggested he was a flight risk. The Government argues that the use of handcuffs was reasonable based on the officers' concerns for their safety. But the safety concerns primarily arose because Defendant lied about his parole status. However, as discussed above, it was improper for Officer Ecker to inquire about Defendant's parole status. Thus, Officer Ecker's knowledge of Defendant's lie was tainted by the illegality of the parole question. Moreover, while Defendant's prior conviction is serious, the situation did not suggest that Defendant presented a threat to officers' safety in that moment. Nor does the fact that Officer Ecker told Defendant that he was not under arrest negate the custodial situation. *Gallegos*, 308 F.3d at 992 (whether detention "was an arrest or an investigatory stop depends on what the officers *did*, not on how they *characterize* what they did."). Thus, the use of handcuffs turned the investigatory stop into an arrest requiring probable cause. Here, the Government does not contend that the police had probable cause to arrest Defendant at this point in the encounter. Accordingly, the pre-car search

arrest was a violation of Defendant's Fourth Amendment rights.

The Government argues however, that even if the detention ripened into an arrest prior to the discovery of the firearm, the arrest should not result in the suppression of evidence because neither Defendant's gun nor his later statements were fruits of the initial handcuffing.  The Court agrees.  The Ninth Circuit has made clear that "evidence qualifies as 'fruit of the poisonous tree' when 'the illegal activity tends to significantly direct the investigation to the evidence in question.'… 'The focus…is on the causal connection between illegality and the evidence.'" *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017) (quoting *United States v. Johns*, 891 F.2d 243 (9th Cir. 1989)).

Here, the gun was found during the search of Defendant's vehicle, which was conducted pursuant to his parole search condition.  The gun was not discovered based on a search incident to arrest.  Thus, the initial handcuffing does not warrant suppression of the gun because it is not causally connected to the evidence.  Nor are Defendant's incriminating statements to the officers the fruits of the initial handcuffing.  Once the gun was discovered, the officers had probable cause to arrest Defendant.  *See Maryland v. Pringle*, 540 U.S. 366, 372 (2003).  At that time, they informed Defendant he was under arrest and read him his *Miranda* rights.  It was then that Defendant made the incriminatory statements.  Thus, those statements did not stem from the initial handcuffing.

The Court finds the Government has met its burden to show that gun and the statement were not the fruit of the unconstitutional arrest and DENIES Defendant's motion to suppress on that basis.

**E.      The Officers Had Reasonable Suspicion to Pat-Search Defendant.**

Defendant also argues that the officers pat-searched Defendant without reasonable suspicion that he was presently armed and dangerous.  "A search of a parolee that complies with the terms of a valid search condition will usually be deemed reasonable under the Fourth Amendment."  *United States v. Cervantes*, 859 F.3d 1175, 1183 (9th Cir. 2017).  An officer's advance notice of a search condition typically "validates a subsequent warrantless search."  *United States v. Miller*, No. 4:15-cr-00197-JD-1, 2016 WL 80565, at *2 (N.D. Cal. Jan. 7, 2016) (citing

United States District Court
Northern District of California

1  *United States v. Caseres*, 533 F.3d 1064, 1075-76 (9th Cir. 2008).  In addition, the United States

2  Supreme Court and the California Supreme Court have found that parole is akin to imprisonment

3  and parolees "have severely diminished expectations of privacy by virtue of their status alone,"

4  even less than probationers.  *Samson v. California*, 547 U.S. 843, 852 (2006); *see also People v.*

5  *Schmitz*, 55 Cal. 4th 909, 921 (2012) (same).  Suspicionless searches of parolees are lawful "so

6  long as they are not conducted arbitrarily, capriciously, or for harassment."  *People v. Douglas*,

7  240 Cal.App.4th 855, 861 (2015); *see also Samson*, 547 U.S. at 856-57.

8       At the time of the traffic stop, Defendant was subject to a written parole condition stating

9  that his person, residence, and any property under his control could be searched by any "peace

10  officer, at any time of the day or night, with or without a search warrant, with or without case."

11  (Dkt. 64-1, Gov't's Opp'n, Ex. C.)  The records check revealed that Defendant was a parolee of

12  the State of California related to a violation of Penal Code section 187.  (Tamburello Decl., Ex. 1

13  at 7; Suppl. Ecker Decl. ¶ 9.)  Officer Ecker understood this to mean that Defendant was subject to

14  a search clause that authorized a search of his person, possession, and vehicle.  Thus, Officer

15  Ecker had advance notice of the search condition and knew Defendant was on parole before he

16  searched him.  This distinguishes this case from *Caseres*, where the officer lacked knowledge of

17  the detainee's parole status prior to making the arrest.

18       Defendant argues that Officer Ecker lacked advance notice of the search condition because

19  the Government has not shown that Officer Ecker saw Defendant's actual "Notice and Conditions

20  of Parole" prior to conducting the pat down.  Defendant cites no authority for the proposition that

21  an officer must see the actual notice and conditions to satisfy the advance notice requirement.

22  Indeed, reliance on information relayed in a records check is commonly found to provide

23  sufficient advance notice.  *See United States v. Jackson*, 4:19-cr-00010-JD-1, 2020 WL 6047235,

24  at *2 (N.D. Cal. Oct. 13, 2020) (finding officer had knowledge of parole status based on dispatch

25  report which the officer understood to mean that he was subject to a search clause); *see also*

26  *Miller*, 2016 WL 80565, at *1.[2]

27

28  ─────────
[2] Defendant does not argue that Officer Ecker engaged in an arbitrary or harassing search.

1   Finally, the pat down did not produce any evidence.  Therefore, even if it was a violation

2   of Defendant's Fourth Amendment rights, it is irrelevant to the discovery of the evidence

3   Defendant seeks to suppress here.

4   The Court DENIES Defendant's motion to suppress on this basis.

5   **F.   The Search of the Car Did Not Violate the Fourth Amendment.**

6   Defendant also argues that the Government's search of the car violated the Fourth

7   Amendment.  It is undisputed that at the time his vehicle was searched, Defendant was subject to

8   search condition as a term of his parole that authorized the search of any property under

9   Defendant's control.  Officer Ecker was aware that Defendant was on parole and knew from his

10   training and experience that California parolees are subject to that search condition.  Officer Ecker

11   had reason to believe that the car was property under Defendant's control because he was driving

12   it and told the officers that it was registered to him.  *See United States v. Korte*, 918 F.3d 750, 754

13   (9th Cir. 2019) (finding the defendant's reference to the vehicle as "my car" authorized the search

14   of the vehicle as "property under his control").  California's parole search condition, which Officer

15   Ecker was aware of, authorized the search of Defendant's vehicle.  Accordingly, Officer Ecker's

16   search of the vehicle was not unlawful.

17   The Court DENIES Defendant's motion on this basis.

18   **G.   The Recording of Defendant Did Not Violate the Fourth Amendment.**

19   After the officers arrested Defendant and Ms. Kindred and put them both in the patrol car,

20   Officer Ecker placed his AVR in the patrol vehicle to capture conversation between the two.

21   Defendant argues that by recording Defendant's communications in this way, the officers violated

22   the Fourth Amendment, the Federal Wiretap Act, and California law, and thus, all fruits of the

23   illegal conduct must be suppressed.

24   The recording of Defendant's conversation in the police car does not violate the Federal

25   Wiretap Act or the Fourth Amendment because a person in custody does not have a reasonable

26   expectation of privacy inside a police vehicle.  *See United States v. Parker*, 371 Fed. App'x 749,

27   750-51 (9th Cir. 2010) (Federal Wiretap Act); *see also United States v. Turner*, 209 F.3d 1198,

28   1200-1201 (10th Cir. 2000) (no violation of the Fourth Amendment); *United States v. Clark*, 22

United States District Court
Northern District of California

12

1   F.3d 799, 802 (8th Cir. 1994) (same).

2       The recording also does not violate California law.  California Penal Code section 633

3   protects electronic recording and eavesdropping in the course of criminal investigations.  *See*

4   *Rattray v. City of Nat'l City*, 51 F.3d 793, 797 (9th Cir. 1994).  Defendant's arguments to the

5   contrary are unpersuasive.  In any event, even if the recordings were unlawful, that unlawfulness

6   would not warrant the suppression of the gun or Defendant's incriminating statements because the

7   recording did not lead to the discovery of any evidence.  Indeed, Defendant does not dispute that

8   nothing of note was obtained from the recording.  Thus, the Court DENIES Defendant's motion

9   on this basis.

10      For the foregoing reasons, the Court concludes that the gun was discovered as the result of

11  a lawful search of Defendant's vehicle pursuant to the search condition.  None of Defendant's

12  arguments for suppression of the gun stand.

13  **H.    Defendant's Statements are Admissible.**

14      Defendant argues that his statements to Officer Ecker must be suppressed because Officer

15  Ecker interrogated Defendant after he invoked his right to counsel and his right to remain silent.

16  Defendant contends that the police questioning was coercive in violation of the Fifth Amendment,

17  and the Government should therefore be prohibited from using Defendant's statements against

18  him.

19      Inculpatory statements made by a defendant during a custodial interrogation are admissible

20  when a defendant's waiver of his Miranda rights is "voluntary, knowing, and intelligent."  *United*

21  *States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998).  The government has the burden of proving

22  by a preponderance of evidence that defendant knowingly and intelligently waived his privilege

23  against self-incrimination and his right to counsel.  *Miranda v. Arizona*, 384 U.S. 436, 475 (1966);

24  *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

25      If the defendant invokes his right to counsel, interrogation must cease "unless the accused

26  himself initiates further communication, exchanges, or conversations with the police."  *Edwards v.*

27  *Arizona*, 451 U.S. 477, 484-85 (1981).  In such instances, the prosecution must show that

28  subsequent events indicated a waiver of the right to have counsel present during the interrogation.

United States District Court
Northern District of California

*Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983).  A sufficient initiation by the defendant occurs when statements to the police "evince[] a willingness and a desire for a generalized discussion about the investigation…[that are] not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Id.* at 1045-46.  *Edwards* and its progeny establish a clear line preventing police initiation after a suspect has invoked his or her *Miranda* rights.  However, these cases also recognize that the accused may change his mind and initiate communication.  Whether that is what occurred is a factual question.  *United States v. Michaud*, 268 F.3d 728, 737 (9th Cir. 2001).

Here, Officer Ecker advised Defendant of his rights and ceased questioning Defendant once Defendant stated that he would no longer speak without an attorney present.  Several minutes later when Officer Ecker returned to the police vehicle, Defendant said "Hey officer?"  Officer Ecker responded, "What's up man?"  Defendant then said, "I really don't want her to go down for [stuff] she ain't got nothing to do with."  (Ecker BWC at 29:28-36.)  On these facts, the Court concludes that after invoking his *Miranda* rights, Defendant initiated further conversation with Officer Ecker.  Officer Ecker reacted to Defendant's re-initiation of the conversation; he did not coerce or badger Defendant into speaking.  *Michaud*, 268 F.3d at 737 (finding no attempt to unconstitutionally coerce the defendant into speaking where the police "merely reacted" to the suspect's initiation of conversation).  Similarly, the record does not support Defendant's argument that Officer Ecker deliberately attempted to elicit a confession by informing Defendant that both he and Ms. Kindred would be arrested and placing them in the back of the patrol car together.  *See United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003) ("Reciting potential penalties or sentences does not constitute coercion.").

Defendant argues that even if he initiated conversation with Officer Ecker, the initiation cannot be taken as a knowing, intelligent, and voluntary waiver of his rights.  To show Defendant's waiver was voluntary, the Government must show that it was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Rodriguez*, 872 F.3d at 921.  This depends on "both the police methods used to produce the waiver and the individual characteristics of the suspect to determine whether the suspect's will was overborne." *Id*. at 922-

23.  Low intelligence does not categorically make a confession involuntary, but it is "relevant…in establishing a setting" in which police coercion may overcome the will of a suspect.  *United States v. Preston*, 751 F.3d 1008, 1026 (9th Cir. 2014); *see also United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998) ("A defendant's mental capacity bears directly upon the question whether he understood the meaning of his *Miranda* rights and the significance of waiving his constitutional rights.").

Here, Defendant asserts that he has a severely diminished mental capacity.  He discusses at length findings from a separate proceeding purporting to establish his diminished mental capacity, including that his IQ is 70.  The Government does not dispute that Defendant has intellectual and cognitive disabilities.  However, even taking Defendant's mental capacities into consideration, the Court cannot conclude, based on the totality of the circumstances, that Defendant's "will was overborne" when he re-initiated conversation with Officer Ecker.

First, the record belies Defendant's arguments of officer coercion.  Defendant contends that Officer Ecker's decision to place Ms. Kindred in the vehicle with him was coercive and done for the purpose of eliciting a post-invocation confession.  But at the time Ms. Kindred was put in the police vehicle, the officers did not know who had ownership of the gun that had been found in the car.  Thus, both occupants were arrested and to be transported to the station.  The act of placing Ms. Kindred in the patrol car was not coercive; it was the reasonable next step in the investigative process.  Moreover, the bodycam footage shows that the officers treated Defendant and Ms. Kindred respectfully throughout the entire traffic stop and arrest.  While Defendant's deficits may have made him more susceptible to coercion had any occurred, there is no evidence that Defendant was subjected to coercive tactics here. [3]

Additionally, based upon the review of the bodycam footage, the Court agrees with the Government that Officer Ecker did not have reason to believe that Defendant was confused or had diminished capacities during the interaction.  Although Officer Ecker repeated himself while advising Defendant of his rights, it appears he did so to ensure Defendant heard and understood

---

[3] Defendant's arguments regarding his relationship with Ms. Kindred and her child are speculative and unsupported by evidence in the record.

him not because he had reason to doubt Defendant's mental capacity.  Indeed, nothing in Defendant's demeanor, composure, or responsiveness during the encounter conveyed that Defendant did not understand his rights.

Considering the totality of the circumstances, the Court concludes that Defendant understood his rights and his waiver was knowing, voluntary, and intelligent.  The Court DENIES Defendant's motion to suppress the statements made to Officer Ecker regarding ownership of the gun.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is DENIED.

**IT IS SO ORDERED.**

Dated: March 16, 2022

JEFFREY S. WHITE
United States District Judge